IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

PIASA COMMERCIAL INTERIORS, INC.,

Plaintiff,

v.

J.P. MURRAY COMPANY, INC, d/b/a
MURRAY COMPANY, et al.,                    No. 07-617-DRH

Defendant.

## ORDER

HERNDON, Chief Judge:

### I. Introduction

Now before the Court is a Motion for Summary Judgment (Doc. 38) filed by Defendant J.P. Murray Company, Inc. d/b/a/ Murray Company ("Murray Company"). Plaintiff has filed an opposing Response (Doc. 69). Defendant has filed a reply (Doc. 77). For the following reasons, the Court **DENIES** Defendants' Motion (Doc. 38).

### II. Factual Background

The undisputed facts presented state that sometime before April 14, 2006, Defendant entered into a contract with Richmond Memorial Hospital as a general contractor. Plaintiff entered into a contract on or about April 14, 2006 to perform drywall frame and board, spray-on fireproofing, acoustical and E.I.F.S. work which Defendant was obligated to perform for Richmond. The original

subcontract amount was for $446,713.00. On June 21, 2007, Defendant issued a notice of termination, terminating Plaintiff's subcontract with Defendant.

From the period between the date Plaintiff entered into the contract and when Defendant terminated the contract on June 21, 2007, the parties present two different versions of events.

Plaintiff contends that it performed the subcontract with Defendant to the extent that performance of the overall project by Defendant permitted Plaintiff to perform its subcontract. (Doc. 2 ¶10). The subcontract work involved work to both the existing hospital building and a new section of the hospital added as part of the hospital project. (Doc. 69, Ex. 1 ¶35). The vast majority of Plaintiff's subcontract work involved work on the new building, while a small part involved work on the existing building. (*Id.*).

Part of Plaintiff's job was to install spray-on fireproofing material on the roof deck. Prior to applying the material, Plaintiff warned Defendant that the material shouldn't be applied on the underside of the roof deck until all work on the roof was completed because substantial roof traffic could affect the finished product as specifically warned in the installation specifications. (Doc. 2 ¶14; Doc. 70, p.4 ¶14). Roof traffic could cause the fireproofing to delaminate and fall from the underside of the roofing deck. (Doc. 70, p.4 ¶14; Doc. 69, Ex. 1, ¶¶29-31). After Plaintiff added the spray-on material, Plaintiff contends that Defendant's roofing subcontractor worked extensively on the roof leading to extensive roof traffic and Defendant and its roofing subcontractor failed to place roof padding or plywood

sheets or take other precautionary methods while the extensive roof traffic occurred (Doc. 2 ¶15-16).

On May 2, 2007, Defendant suspended work on the new building part of the project while it investigated the cause of spray-on fireproofing that had fallen from the roof deck (Doc. 70, p. 2 ¶6; Doc. 69, Ex. 1 ¶¶33-34, 38-44). Defendant did not inform Plaintiff either in writing or orally that Defendant believed that Plaintiff had improperly installed the spray-on fireproofing and Defendant further refused to give Plaintiff copies of two reports of Thermal Consulting, the company retained by Defendant to examine the spray-on fireproofing on the roof deck, issued on May 19, 2007 and July 27, 2007. (Doc. 70 p. 2 ¶7; Doc. 69 Ex. 1 ¶¶33-34, 38-44, 46-50). Plaintiff contends it was merely notified that the spray-on fireproofing had fallen and that Defendant had retained a consultant to determine the cause. (Doc. 69, Ex. 1 ¶13; Doc. 38, Ex. K&L). Plaintiff performed little work between May 2 and May 18, 2007 because, it alleged, almost all of its work described on the 3-week schedule consisted of work on the new building project and the work had been suspended as of May 2, 2007. (Doc. 69, Ex. 1 ¶¶60, 62 & 69-70; Doc. 70, p. 4 ¶¶12 &13). Plaintiff repeatedly offered to perform the small amount of remaining work in a piece mill fashion if Defendant would be willing to pay extra costs that would result from working in that fashion. (*Id.* at ¶62; Doc. 38, Exhibits H, J, & Q).

Plaintiff last performed work on May 18, 2008. (Doc. 2 ¶18). At that time, Plaintiff had performed 97.95 percent of its subcontract work on the project. (Doc. 70, p. 2 ¶5). On June 6, 2007, Plaintiff received a facsimile memo which

stated that Plaintiff should be performing work described in the 3-week schedule sent to it on May 31, 2007. (Doc. 69, Ex. 1 ¶77-78). The memo attached the 3-week schedule and stated that "It is imperative that this drywall work is started immediately. If Plaintiff does not start this work immediately, Murray Co. will have no recourse but to hire another firm to complete, and back-charge Piasa for the cost." (Doc. 69, Ex. F p. 8). Plaintiff contends that the drywall work could not have been performed while work on the new building was suspended and that much of the work on the work on the 3-week schedule could not be performed due to the suspension. (Doc. 69 ¶72 & 79; Ex. G pp.50-51). Plaintiff further contends that the memo did not mention termination and did not constitute a seven day advanced notice as required by the subcontract. (Doc. 70 p. 3 ¶11; Doc. 69, Ex. 1 ¶¶ 77-79).

On June 21, 2007, Defendant issued a notice of termination, terminating Plaintiff's subcontract with Defendant. (Doc. 2 ¶19). The letter stated that Plaintiff's subcontract was being terminated because it had failed to timely perform work on the 3-week schedule and had not performed work since May 2, 2007. (Doc. 69 ¶60). On June 22, 2007, Plaintiff responded to the notice with a facsimile memo offering to complete the work and begin working on June 25, 2007, but Defendant responded that the subcontract had been terminated and Plaintiff would be removed from the premises if it showed up at the site. (Doc. 2 ¶20-21, Ex. D &E; Doc. 69 ¶62 & 64; Doc. 32, Ex.V).

Plaintiff contends that the termination on June 21, 2007 was in violation of the subcontract because Defendant did not provide seven (7) days written notice

and the Defendant terminated without certification by the architect that sufficient cause existed for such an action, as required by Section 14.2.2 of AIA 201 (1997 edition). (Doc. 19 ¶18). Plaintiff states that the contract unambiguously incorporates the project manual as part of the subcontract and the project manual in turn adopts A.I.A. 201. (Doc. 70, p. 2 ¶2; Doc. 69, Ex. 1 ¶¶4-5 & 9-10). Plaintiff contends that Defendant was required to file written notices of any complaints it had with Plaintiff's work with both Plaintiff and the architect. (Doc. 70, p. 3 ¶10; Doc. 69 Ex. 1 ¶¶10-14). Plaintiff further contends that the subcontract required Defendant to provide Plaintiff with seven days written advance notice and a written certificate from the architect showing that there was just cause for termination. (Doc. 70, p. 3 ¶11). Plaintiff alleges that it is disputed as to whether the June 6, 2007 memo constituted advance notice and the memo never mentioned termination. (Doc. 70, p. 3 ¶11; Doc. 69, Ex. 1 ¶77).

Plaintiff also alleges that Defendant had failed to pay Plaintiff amounts due under payment applications No. 8 and 9 in breach of the subcontract. Plaintiff submitted pay application No. 8 to Defendant on April 19, 2007 for work performed between March 20 and April 18, 2007. (Doc. 69, Ex. 1 ¶18). On May 18, 2007, Plaintiff submitted its pay application No. 9 to Defendant for work performed between April 19 and May 18, 2007. (*Id*. at ¶20). Both payments were due when Defendant received its payment for the same work from the owner (*Id*. at ¶¶18 & 20). Plaintiff contends that the pay application No. 8 would have been due during May 2007 while No. 9 would have been due sometime in June. (*Id*. at ¶¶ 21-22). On

June 7, 2007, Plaintiff instructed its attorney to send Defendant a letter demanding payment on No. 8 and threatening a mechanic's lien for nonpayment, but Defendant never responded to the letter. (*Id*. at ¶19; Doc. 38, Ex. R). By the termination date of June 21, 2007 Defendant allegedly had been paid by owner for No. 8 and perhaps even for No. 9. Plaintiff alleges that this failure to pay the amounts due under both pay applications was a breach of the subcontract. (*Id*. at ¶27).

Defendant, however, presents a different version of the events. Defendant states that throughout the time Plaintiff worked on the project, Defendant experienced significant problems with Plaintiff's work. (Doc. 39, p. 5; Doc. 38, Ex. 1 ¶4). Plaintiff's application of spray-one fireproofing material to the metal roof deck was defective, Plaintiff "repeatedly failed to provide sufficient manpower for the Project, and [Plaintiff] failed to timely complete its work." (*Id.*). Defendant contends that Plaintiff sent only two workers to the project from April 18, 2007 to May 2, 2007 and those workers were only on the site for three days during that period including April 30, May 1, and May 2. (*Id.*; Doc. 38, Ex. 1 ¶5-6). Plaintiff completely stopped work on May 2, 2007. (Doc. 38, Ex. 1 ¶7).

Defendant also contends that Plaintiff repeatedly made statements that it was not going to perform its contractual duties between April and June 2007. Specifically, on April 13, 2007, Plaintiff sent Defendant a change of order proposal stating that it wasn't going to finish the portion of its subcontract related to the original hospital building. (Doc. 39 p. 5; Doc. 38, Ex. 1 ¶14, Ex. D).

Defendant states that it continually gave Plaintiff opportunities to work

between April and May 2. On April 18, 2007 Defendant sent Plaintiff a letter noting that it was not on site that day and asking Plaintiff to give Defendant written notice as to whether it was no longer working on the project. (Doc. 38, Ex. 1 ¶15, Ex. E). Plaintiff's response was that it was turning the project over to its attorney to begin "the process of terminating [its] contract." (*Id*. at ¶16 & Ex. F). On April 20, Defendant sent another memo demanding that Plaintiff perform work on April 23 or Defendant would take steps to terminate the subcontract, but Plaintiff responded that it would not be on site on April 23. (*Id*. at ¶17-18, Ex. G, Ex. H). On May 3, Plaintiff sent a fax stating it was turning the dispute over the fireproofing material over to its attorney. (Doc. 39 at p. 6; Doc. 38, Ex. J).

Even after Plaintiff stopped work on May 2, 2007, Defendant maintains that it offered Plaintiff several opportunities to continue work on the project. On May 23, 2007, Defendant sent a fax to Plaintiff including a list of the work that still needed to be completed by Plaintiff. (Doc. 38, Ex. N). When Plaintiff failed to appear on site to do any of the listed work, Defendant again sent a fax listing the work that needed to be completed by Plaintiff. (Doc. 39, p. 6; Doc. 38, Ex. 1 ¶25, Ex. O). On June 6, 2007, Defendant sent Plaintiff a letter warning it that if certain work was not completed immediately, Defendant would have to hire another subcontractor to complete the work and charge Plaintiff for the costs. (*Id*. at p. 6, Doc. 38, Ex. 1, ¶¶8 &26, Ex. P). Plaintiff responded that it would not return to work until it could complete the entire drywall work at one time, contrary to the work schedule. (*Id*., Doc. 38, Ex. 1 ¶27, Ex. Q). That response also stated that Plaintiff was going to file

a lien on the project for past due amounts and on June 7, 2008 Defendant received a letter from Plaintiff's attorney stating that he had been instructed to file a mechanic's lien and lawsuit unless certain payments were received by June 12, 2007 (*Id.* at p. 7; Doc. 38, Ex. 1 ¶¶27-28, Ex. Q &R). On June 15, 2008, Plaintiff sent Defendant a notice of intent to file a mechanic's lien. (*Id.*, Doc. 38, Ex. 1 ¶30, Ex. T).

After Plaintiff had failed to work on the project for over six weeks and, as Defendant alleges, despite repeated requests by Defendant to perform its obligation, Defendant sent Plaintiff a letter on June 21, 2007 stating that it was terminating its subcontract. (*Id.*, Doc. 38, Ex. 1 ¶31, Ex. U). On June 22, 2007, Plaintiff sent a letter, responding to Defendant's letter terminating the agreement, stating that it would be on the project on June 25, 2007 but demanding it be allowed to perform work in a sequence contract to the work schedule established by Defendant. (*Id.* at p. 7 n.1; Doc. 38, Ex. 1 ¶¶10 & 32, Ex. V).

As to the terms of the subcontract agreement, Defendant contends that the subcontract agreement unambiguously allows Defendant, upon default by Plaintiff, to terminate Plaintiff "immediately upon notice and demand." (*Id.* at p. 9; Doc. 38, Ex. 1 ¶11, Ex. A ¶5(a)). Defendant disputes that AIA A201 applies to the subcontract agreement with Plaintiff. (Doc. 39 at p.11).

August 29, 2007, Plaintiff filed its three count complaint seeking monetary damages against Defendants Murray Company and Fidelity and Deposit Company of Maryland for breach of contract, breach of payment bond, and vexatious refusal to pay. (Doc. 2). On September 25, 2007, Defendant Murray Company filed

a counter-claim alleging breach of contract against Plaintiff. Defendant Murray Company contended that it and Plaintiff entered into a Subcontract Agreement where Plaintiff agreed to provide all the necessary labor, materials, and equipment to perform all the Drywall Frame and Board, Spray-on Fireproofing, Acoustical and E.I.F.S. work for the Project pursuant to particular plans and specifications. (Doc. 8, ¶ 6). Defendant Murray Company alleged that Plaintiff breached the contract in several ways including: 1) failing to timely perform the Subcontract work and ultimately failing to complete the Subcontract Work, 2) failing to provide sufficient manpower and failing to timely order materials and equipment to ensure the Subcontract Work would be timely completed, 3) failing to properly install the fireproofing material on the metal roof deck by, among other errors, applying the material at an improper thickness, and failing to properly apply the adhesive, 4) failing to appropriately acknowledge and timely notify other contractors of the risk of harm to the fireproofing material if there was improper traffic on the roof, and 5) by damaging the fireproofing material through its own foot traffic. (*Id*. at ¶ 11(a) - (e)).

In response to Defendant Murray Company's counterclaim, Plaintiff filed an answer arguing that Defendant Murray Company had breached the subcontract by, among other things, terminating the subcontract without seven days advance written notice and without certification by the architect that sufficient cause existed for such action, as required by Section 14.2.2 of AIA 201 (1997 Edition). (Doc. 19, ¶18). Because of this breach, Plaintiff argues that it was relieved from any obligation

to perform any remaining parts of the subcontract agreement. (*Id*. at ¶20).

Defendant Murray Company has moved for partial summary judgment, making the argument that it followed the proper contractual procedures in terminating the Subcontract Agreement. Defendant is seeking summary judgment in regards to Plaintiff's affirmative defense that Defendant Murray Company's Counterclaim is barred because Defendant failed to give Plaintiff seven (7) days written notice of termination or a certificate from the Project architect which stated that termination was proper.

### III. Discussion

**A. Summary Judgment**

Summary judgment is appropriate under the Federal Rules of Civil Procedure when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **FED. R. CIV. P. 56(c);** ***Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).** The movant bears the burden of establishing the absence of factual issues and entitlement to judgment as a matter of law. ***Wollin v. Gondert*, 192 F.3d 616, 621-22 (7th Cir. 1999).** The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. ***Schneiker v. Fortis Inc. Co.*, 200 F.3d 1055, 1057 (7th Cir. 2000);** ***Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999).** In response to a motion

for summary judgment, the non-movant may not simply rest on the allegations as stated in the pleadings. Rather, the non-movant must show through specific evidence that an issue of fact remains on matters for which the non-movant bears the burden of proof at trial. **Walker v. Shansky, 28 F.3d 666, 670-71 (7th Cir. 1994), aff'd, 51 F.3d 276 (citing Celotex, 477 U.S. at 324).**

No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." **Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted);** accord **Starzenski v. City of Elkhart, 87 F.3d 872, 880 (7th Cir. 1996); Tolle v. Carroll Touch, Inc., 23 F.3d 174, 178 (7th Cir. 1994).** "[P]laintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment." **Weeks v. Samsung Heavy Industries Co., Ltd., 126 F.3d 926, 939 (7th Cir. 1997).** In other words, summary judgment may not be averted merely by the non-moving party "baldly contesting his adversary's factual allegations," but instead the Plaintiff must come forth with probative evidence to substantiate the allegations of the complaint. **Oates v. Discovery Zone, 116 F.3d 1161, 1165 (7th Cir. 1997) (citing First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 290 (1968); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).**

**B.     Analysis**

Defendant Murray Company argues that it is entitled to judgment on Plaintiff's defense that Defendant did not comply with the procedures for termination because the subcontract agreement allowed Defendant Murray Company to terminate Plaintiff "immediately upon notice." (Doc. 39). In the alternative, Defendant Murray Company argues that it did comply with the seven days notice of termination. (*Id.*) Further, in the alternative, Defendant Murray Company argues that it was entitled to terminate the subcontract without any certification because Plaintiff anticipatorily repudiated the subcontract agreement. (*Id.*).

However, having reviewed the parties' memorandum and statement of facts, the Court finds that there are numerous genuine disputes of material facts. The Plaintiff and Defendant present two entirely different version of events regarding Plaintiff's work between April and June 2007. While Plaintiff contends that it offered to work on the project numerous times, albeit in a piecemeal fashion because much of the project work was suspended during May and June, Defendant contends that Plaintiff refused to work on the project and that Defendant gave Plaintiff numerous opportunities to return to work, but that Plaintiff refused to return to the project. Plaintiff and Defendant even dispute about the date that Plaintiff stopped work on the project. Plaintiff contends that it completed little work between May 2 and May 18, but stopped work completely on May 18. Defendant, on the other hand, contends that Plaintiff performed only small amounts of work between April 18 and May 2, but stopped work completely on the project on May 2.

With regards to whether Defendant followed the proper contractual procedures, there is a genuine dispute as to whether AIA 201 is part of the subcontract agreement. Both claim that the contract is unambiguous and supports their own interpretation. Defendant maintains that AIA 201 was not part of the subcontract with Plaintiff. Defendant states that the Project manual which incorporates AIA 201 was only included as one of the contract documents and project manual was "never expressly incorporated into the Subcontract Agreement." (Doc. 39, p. 11 n.2). Plaintiff, however, contends that ¶1(d) of the subcontract stated that the contract documents, including the project manual, was included as an exhibit to the contract and that AIA 201 was part of the project manual, and the project manual, in turn, was part of the subcontract. Thus, the question is whether AIA 201 is part of the subcontract or not. Further, Defendants claim that if AIA 201 is part of the contract, the provision calling for a seven day notice and certification from the architect before termination contradicts with the provision in the contract allowing Defendant to terminate immediately upon notice. However, Plaintiff claims that the two provisions can be read harmoniously, with AIA 201 setting out the method for determining the default required to trigger termination as per the terms of the subcontract.

On the issue of whether Defendant complied with the seven day notice, assuming it was part of the contract, the parties also have disputes of fact. Defendant argues that it sent Plaintiff a memo on June 6, 2007 stating that it would have to find another firm to complete the work if Plaintiff did not start work on the

project. Defendant contends that this memo constituted notice of termination and it was sent fifteen days before the termination letter of June 21, 2007, well within the provisions of Section 14.2.2 of AIA 201. Defendant also states it was not required to obtain an architect certificate. However, Plaintiff contends that the June 6, 2007 memo did not mention termination and did not constitute notice. Plaintiff also alleges that Defendant failed to obtain an architect certificate which it contends Defendant was required to do.

The parties also dispute whether there was an anticipatory repudiation on the part of the Plaintiffs. Defendant contends that Plaintiff failed to work during the months of April, May, and June and, on numerous occasions, stated that it was not going to return to the project even after Defendant offered Plaintiff numerous opportunities to return to work. Plaintiff, on the other hand, stated that it worked on the project in April and very little from May 2 through May 8. Plaintiff also contends that it offered to work on the project piecemeal and that very little work remained on the subcontract, most of which included work in the new building which had been suspended by Defendants on May 2.

Therefore, the Court finds that there are too many conflicting and disputed facts which preclude the Court from entering summary judgment for Defendant Murray Company.

## IV. Conclusion

Therefore, the Court finds that Defendant is not entitled to summary judgment on Plaintiff's affirmative defense and Defendant's motion for partial

summary judgment (Doc. 38) is **DENIED**.

       **IT IS SO ORDERED.**

Signed this 11th day of March, 2009.

                                      /s/       David R Herndon
                                      **Chief Judge**
                                      **United States District Court**